# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

JEFFREY KENT,                          :
                                       :
            Petitioner,                :
                                       :
      v.                               :        Civil Action No. 18-1760-CFC
                                       :
ROBERT MAY, Warden,                    :
and ATTORNEY GENERAL OF THE            :
STATE OF DELAWARE,                     :
                                       :
            Respondents.               :

---

## MEMORANDUM OPINION

Jeffrey Kent.  *Pro Se* Petitioner.


Brian L. Arban, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.  Counsel for Respondents.


March 29, 2022
Wilmington, Delaware

CONNOLLY, CHIEF JUDGE:

Pending before the Court is an Amended Petition for a Writ of Habeas Corpus

Pursuant to 28 U.S.C. § 2254 filed by Petitioner Jeffrey Kent. (D.I. 15)  The State filed

an Answer in opposition, to which Petitioner filed a Reply. (D.I. 19; D.I. 26)  For the

reasons discussed, the Court will deny the Amended Petition.

I.      BACKGROUND

> On June 30, 2011, Dewey Lee was stopped at the intersection of West 8th and Monroe Streets in Wilmington, Delaware. While he was stopped, a man on a bicycle approached his vehicle and began speaking with him.  At some point during the conversation, the man on the bicycle shot Lee. Lee's vehicle then accelerated west on 8th Street before striking a utility pole. The man on the bicycle fled north on Monroe Street.
>
> When the Wilmington Police responded to the scene, they found Lee behind the wheel of his vehicle. He was unresponsive and bleeding from a gunshot wound to his torso. He died as a result. During the investigation, the Wilmington Police located three eyewitnesses: Thurman Boston, Brianna Brown ("Brianna"), and Dajuan'ya Brown ("Dajuan'ya"). All three identified Kent as the man on the bicycle.

*Kent v. State*, 135 A.3d 79 (Table), 2016 WL 1039125, at *1 (Del. 2016).

In February 2013, a New Castle County grand jury indicted Petitioner on charges

of first degree murder and possession of a firearm during the commission of a felony

("PFDCF"). (D.I. 19 at 1)  Two attorneys from the Office of the Public Defender ("OPD")

were appointed to represent him.

On September 18, 2014, a Delaware Superior Court jury convicted Petitioner of

both charges. *See Kent*, 2016 WL 1039125, at *3.  Petitioner filed motions for judgment

of acquittal and for a new trial, which the Superior Court denied. *See id.*  On December

19, 2014, the Superior Court sentenced Petitioner to life imprisonment for first degree

murder and to 10 years of incarceration for PFDCF. *See id.* Petitioner appealed, and the Delaware Supreme Court affirmed his convictions and sentence in March 2016. *See id.*

In April 2016, Petitioner filed a *pro se* motion for post-conviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion"). (D.I. 20-10 at 214-15) The Superior Court referred the Rule 61 motion to a Superior Court Commissioner, who appointed counsel to represent Petitioner in his Rule 61 proceeding. Post-conviction counsel filed an amended Rule 61 motion in June 2017. (D.I. 20-10 at 218-251) On September 5, 2017, the Commissioner issued a report recommending the denial of Petitioner's amended Rule 61 motion. (D.I. 20-10 at 298-306); *see State v. Kent*, 2017 WL 3891448, at *3 (Del. Super. Ct. Sept. 5, 2017). The Superior Court adopted the Report and Recommendation and denied the Rule 61 motion on December 5, 2017. (D.I. 20-10 at 307-308) Petitioner appealed the denial of his Rule 61 motion, and the Delaware Supreme Court affirmed the Superior Court's decision in June 2018. *See Kent v. State*, 189 A.3d 1255 (Table), 2018 WL 3156987 (Del. June 26, 2018).

Petitioner filed his original Petition for federal habeas relief in this Court on November 6, 2018. (D.I. 5) In May 2019, upon Petitioner's request, the Court stayed the instant proceeding to enable Petitioner to exhaust his ineffective assistance of counsel claims in the Delaware state courts. (D.I. 6; D.I. 7)

In June 2019, Petitioner filed in the Delaware Superior Court a second *pro se* Rule 61 motion. (D.I. 20-14 at 31-50) On July 1, 2019, the Superior Court summarily dismissed the Rule 61 motion as second or subsequent under Rule 61(d), and the Delaware Supreme Court affirmed that decision in January 2020. (D.I. 20-14 at 51-53;

2

D.I. 20-15 at 1-2); *see Kent v. State*, 225 A.3d 316 (Table), 2020 WL 411333, at *1 (Del. Jan. 24, 2020).

The Court lifted the stay in this proceeding on July 31, 2020. (D.I. 14) Petitioner filed an Amended Petition. (D.I. 15) The State filed an Answer, to which Petitioner filed a Reply. ( D.I. 19; D.I. 26)

## II.    GOVERNING LEGAL PRINCIPLES

### A. The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003). Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Additionally, AEDPA imposes procedural requirements and standards for analyzing the merits of a habeas petition in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

### B. Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the petitioner has exhausted all means of available relief under state law. *See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). AEDPA states in pertinent part:

> An application for a writ of habeas corpus on behalf of a

3

> person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). This exhaustion requirement, based on principles of comity, gives "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 844-45; *see Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).

A petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits. *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples*, 489 U.S. 346, 351 (1989). If the petitioner raised the issue on direct appeal in the correct procedural manner, the claim is exhausted and the petitioner does not need to raise the same issue again in a state post-conviction proceeding. *See Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997).

If a petitioner presents unexhausted habeas claims to a federal court, and further state court review of those claims is barred due to state procedural rules, the federal court will excuse the failure to exhaust and treat the claims as exhausted. *See Coleman v. Thompson*, 501 U.S. 722, 732, 750-51 (1991) (such claims "meet[] the technical requirements for exhaustion" because state remedies are no longer available); *see also Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006). Such claims, however, are

4

procedurally defaulted.  *See Coleman*, 501 U.S. at 749; *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000).  Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted.  *See Coleman*, 501 U.S. at 750*; Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims.  *See McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999); *Coleman,* 501 U.S. at 750-51.  To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Id.* at 494.

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent,"[1] then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001).  The miscarriage of justice

---

[1]*Murray*, 477 U.S. at 496.

exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623 (1998); *Murray*, 477 U.S. at 496. A petitioner establishes actual innocence by asserting "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *See Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

### C. Standard of Review

If a state's highest court adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d). Pursuant to § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial. 28 U.S.C. § 2254(d)(1) & (2); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). A claim has been "adjudicated on the merits" for the purposes of § 2254(d) if the state court decision finally resolved the claim on the basis of its substance, rather than on a procedural or some other ground. *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009). The deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). As explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the

6

absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

Finally, when reviewing a habeas claim, a federal court must presume that the state court's determinations of factual issues are correct. *See* § 2254(e)(1). This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary. *See* § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## III.   DISCUSSION

Petitioner asserts six Claims in his timely-filed Amended Petition: (1) the State violated his due process right to a fair trial by not timely disclosing exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963); (2) the Superior Court erred by not granting Petitioner's motion for a new trial based on instances of prosecutorial misconduct that occurred during closing arguments; (3) the Delaware state courts erred in not finding that trial counsel represented Petitioner while operating under an insurmountable conflict of interest; (4) trial counsel provided ineffective assistance by not providing additional information to the Superior Court about the OPD's conflict of interest in a timely manner; (5) trial counsel provided ineffective assistance by not calling Shaleece Queen to testify as an alibi witness at trial; and (6) cumulative error.

### A. Claim One:  *Brady v. Maryland* Violation

In Claim One, Petitioner asserts that the State violated his due process rights under *Brady v. Maryland* by waiting until the "eve of trial" to disclose exculpatory

evidence.  More specifically, he contends that the "State's delay in disclosing the

statements of Wallace Archy, Monica Miller, and Raheem Smith denied him the

opportunity to use the material effectively and cast doubt on the fairness of the entire

proceeding." (D.I. 15 at 6)  Petitioner presented the same argument in his pre-trial

"motion to dismiss for *Brady* violation and lack of speedy trial." (D.I. 20-3 at 38-53)

The Superior Court denied the motion from the bench, concluding that "there is no

*Brady* violation in this case," because "the defense had the information prior to trial and

may effectively use it." (D.I. 20-9 at 119)  Petitioner raised the same *Brady* argument on

direct appeal, and the Delaware Supreme Court affirmed the Superior Court's

conclusion after determining that there was no *Brady* violation.  *See Kent*, 2016 WL

1039125, at *3.  Given this adjudication, Petitioner's instant *Brady* Claim will only

warrant relief if the Delaware Supreme Court's decision was contrary to, or an

unreasonable application of, clearly established federal law.

  The prosecution's failure to disclose evidence violates a defendant's due process

rights under *Brady v. Maryland* if: (1) the evidence at issue was favorable to the

accused, either because it was exculpatory or it had impeachment value; (2) the

prosecution suppressed the evidence, either willfully or inadvertently; and (3) the

evidence was material.  *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Lambert

v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004).  "Prosecutors have an affirmative duty to

disclose [*Brady*] evidence ... even though there has been no request [for the evidence]

by the accused, which may include evidence known only to police."  *Dennis v. Sec'y,

Pa. Dep't of Corrs.*, 834 F.3d 263, 284 (3d Cir. 2016).  "To comply with *Brady*,

prosecutors must 'learn of any favorable evidence known to the others acting on the

government's behalf.'" *Id.*

The following facts provide important background information relevant to the

Court's analysis of Petitioner's *Brady* argument.

> Shortly after being appointed, [Petitioner's] counsel sent the
> State a discovery request, which included a request for a list
> of the State's witnesses. The State responded, but did not
> provide a list of witnesses, citing concerns for the witnesses'
> safety. This concern may have received some confirmation
> in May 2014 when Wilmington Police came into possession of
> a letter from [Petitioner] requesting that his nephew locate the
> witnesses to the crime.
>
> On July 16, 2014, defense counsel again requested a witness
> list. One reason defense counsel requested the names of the
> witnesses was to identify potential conflicts of interest. The
> State requested a protective order for the witness list on July
> 29, 2014, protecting against disclosure of the names to the
> defendant. In the weeks that followed, a number of witness
> statements were provided to [Petitioner's] attorneys.
>
> Jury selection was scheduled to begin on September 8, 2014.
> On September 2, 2014, the State provided the transcript of
> Monica Miller's statement wherein she stated that she was
> with Brianna and Dajuan'ya at the time of the incident and that
> one could not see the intersection of 8th and Monroe from
> their vantage point.
>
> On September 6, 2014, the State advised […] trial counsel
> that the statements of Wallace Archy, Dexter Briggs, and
> Raheem Smith would not be disclosed because the
> statements contained no *Brady* material. The next day, the
> State changed its position and provided Archy's and Smith's
> statements. In his statement, Archy stated that the shooting
> occurred at a different intersection, 8th and Washington.
> Smith told police that he did not see a white person at 8th and
> Monroe (the victim was white), and that it was impossible to
> see the intersection from where Brianna and Dajuan'ya were
> located.
>
> On the same day that the Archy and Smith statements were
> disclosed, [Petitioner] filed a motion to dismiss, alleging that
> the Miller, Archy, and Smith statements contained *Brady*

9

material, which was disclosed in an untimely manner and
prevented defense counsel from using the evidence
effectively. The following day, the trial court held a hearing on
the motion. The trial court denied [Petitioner's] motion
because [his] trial counsel had been provided the witnesses'
statements, and the State was making all three witnesses
available to be interviewed by defense counsel. The jury was
selected on September 8, 2014, and trial commenced on
September 10, 2014.

*Kent*, 2016 WL 1039125, at *1-2.

In Petitioner's case, the Delaware Supreme Court correctly identified *Brady* as

the applicable law and referred to its analysis in *Starling v. State*, 882 A.2d 747, 756

(Del. 2005) which, in turn, relied on *Brady*. Therefore, the Delaware Supreme Court's

decision is not contrary to clearly established federal law. *See Fahy v. Horn*, 516 F.3d

169, 196 (3d Cir.2008) (Supreme Court of Pennsylvania's decision was not "contrary to"

clearly established federal law because appropriately relied on its own state court

cases, which articulated the proper standard derived from Supreme Court precedent).

Additionally, to the extent there was impeachment or exculpatory material in the

witness statements, the Delaware Supreme Court reasonably applied *Brady* in

concluding that the State's delayed disclosure of those statements and its delayed

presentation of the witnesses themselves did not violate Petitioner's due process rights.

A delayed disclosure of *Brady* material "that [a] defendant[] could use on cross-

examination to challenge the credibility of Government witnesses" does not violate the

defendant's due process rights if the material was disclosed in time for the defendant to

effectively use the material at trial. *See United States v. Higgs*, 713 F.2d 39, 43-4 (3d

Cir. 1983). Due process is satisfied if such material is disclosed the day the witness

testifies. *Id.*

10

Here, the State provided the witness statements and access to the witnesses two days before trial.  During those two days, Petitioner was able to independently assess the statements and the credibility of the witnesses, and ultimately decided to present two of them – Miller and Archy – as witnesses at trial for the defense.  Significantly, Petitioner does not allege how or if the timing of the State's disclosure prevented him from evaluating the relevance and credibility of the witnesses and their statements; nor does he suggest in any way how trial counsel's questioning of Miller and Archy during the trial would have been different if their statements and identities had been disclosed earlier.  In other words, Petitioner has failed to satisfy *Brady*'s requirement of prejudice.

Given these circumstances, the Court concludes that the Delaware Supreme Court's determination that trial counsel had an opportunity to use the witness statements effectively did not involve an unreasonable application federal law.  Accordingly, the Court will deny Claim One for failing to satisfy the standard articulated in § 2254(d)(1).

### B. Claim Two: Prosecutorial Misconduct

> At trial, Boston testified for the State that he was behind Lee at the intersection and that [Petitioner] was the shooter. Brianna and Dajuan'ya both testified that they saw [Petitioner] from the stoop of their home at 814 West 8th Street. Miller testified for the defense that she was with Brianna and Dajuan'ya at the time of the incident, and that one could not see the intersection of West 8th and Monroe from the steps of 814 West 8th Street. Archy, also called by the defense, testified that he was on Monroe Street between 7th and 8th on the evening of the incident. He further testified that he did not observe Lee's vehicle stopped at the intersection and that he saw it speed through the intersection.  Although [Petitioner's] trial counsel was able to interview Smith, he was not called as a witness.
>
> During closing arguments, [Petitioner's] trial counsel implied

11

that Boston may have received a benefit for testifying against Kent. Trial counsel also implied that Boston changed his story to comport with Brianna and Dajuan'ya. In response, the State argued that the jury could only believe trial counsel's suggestion if the jurors were to violate the rule on speculation because there was no evidence that Boston received a benefit, only that he was hoping for help with his case. The State also argued that there was no evidence presented to support a finding that Boston changed his story to appear more credible.

The State also argued that [Petitioner's] trial counsel did not read the entire redacted letter that [Petitioner] had written to his nephew, a statement which was not correct. After the trial court admonished the State regarding the inaccuracy of its statement, the State informed the jury that it was mistaken and that [Petitioner's] trial counsel had, in fact, read the entire letter. Shortly after, the State argued that Archy heard a gunshot and immediately saw a vehicle travel through the intersection. After it was brought to the State's attention that this was incorrect, the State informed the jury that there was a ten to fifteen second delay between the gunshot and when Archy saw the vehicle speed through the intersection.

*Kent*, 2016 WL 1039125, at *2-3. After his conviction, Petitioner filed a motion for new trial alleging prosecutorial misconduct. The Superior Court denied that motion. *Id.*

In Claim Two, Petitioner contends that the Superior Court erred in denying his motion for new trial based on instances of prosecutorial misconduct that occurred during closing arguments. (D.I. 15 at 6-8) Petitioner asserts that the State: (1) impermissibly argued that the "rule against speculation" prevented the jury from concluding that one of its witnesses, Boston, had "changed his story to appear more credible or that Boston may have received an unknown benefit for his testimony;" (2) inaccurately claimed that Petitioner's trial counsel had not read to the jury Petitioner's letter to his nephew in its entirety; and (3) "misstated Archy's testimony regarding the amount of time between the gunshot and observing Lee's vehicle travel through the intersection." (D.I. 15 at 6-7) On

12

direct appeal, Petitioner argued that the Superior Court improperly denied his motion for new trial after rejecting these three arguments alleging prosecutorial misconduct. The Delaware Supreme Court denied the argument as meritless. Therefore, Petitioner will only be entitled to habeas relief for Claim Two if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

In order for a prosecutorial misconduct claim to warrant federal habeas relief, the prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 180, (1986) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). A prosecutorial misconduct claim must be examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). In the Third Circuit, this inquiry involves examining "the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95 (3d Cir. 2001).

Here, although the Delaware Supreme Court did not cite federal constitutional law in its analysis of Petitioner's prosecutorial misconduct arguments, the Court's focus on whether the State's conduct adversely affected the integrity of the judicial process mirrors the inquiry required by *Donnelly* and its progeny.[2] Thus, the Delaware Supreme

---

[2]The State provides an extensive explanation of Delaware's standard for prosecutorial misconduct claims. (D.I. 19 at 17-19) Essentially, the

13

Court's decision was not contrary to clearly established federal law.

The Court must also determine whether the Delaware Supreme Court's rejection of Petitioner's prosecutorial misconduct allegations involved an unreasonable application of clearly established federal law.

### 1. Boston's differing statements

During closing arguments, trial counsel contended that Boston "is an

---

standards for reviewing prosecutorial misconduct are slightly different depending on whether the issue was fairly presented below. If defense counsel raised a timely and pertinent objection to prosecutorial misconduct at trial, or if the trial judge intervened and considered the issue *sua sponte*, [the Delaware Supreme Court] essentially review[s] for 'harmless error.' If defense counsel failed to do so and the trial judge did not intervene *sua sponte*, [the Delaware Supreme Court] reviews only for plain error."

*Spence v. State*, 129 A.3d 212, 218 (Del. 2015).

Under the harmless error analysis, the [Delaware Supreme] Court will first conduct a *de novo* review of the record to determine whether misconduct took place. If [that court] concludes there was no misconduct, [the] analysis ends. If the [Delaware Supreme Court does] determine that the prosecutor engaged in misconduct during trial, [it] then, under the second step of the analysis, "determine[s] whether the [ ] misconduct prejudicially affect[ed] [the] defendant's substantial rights" under the three-factor *Hughes* test. Under *Hughes*, "'[t]he decisive factors are the closeness of the case, the centrality of the issue affected by the (alleged) error, and the steps taken to mitigate the effects of the error.' "

Where the prosecutorial misconduct "fails" the *Hughes* test ... and otherwise would not warrant reversal, [the Delaware Supreme Court] examine[s] *Hunter*—the third step in the harmless error analysis for prosecutorial misconduct—considering whether the prosecutor's statements or misconduct are repetitive errors that require reversal because they cast doubt on the integrity of the judicial process.

*Cannon v. State*, 165 A.3d 288 (Del. 2017). This Court has consistently held that Delaware's standard for evaluating prosecutorial misconduct claims is consistent with *Donnelly* and its progeny. *See, e.g., Price v. Phelps*, 894 F. Supp. 2d 504, 525-526 (D. Del. 2012).

14

accomplished informant.  He looks them in the face, he deceives them, he lies to them, he gets paid for it, he's a professional liar, that's what he is." (D.I. 20-10 at 22)  When discussing Boston's identification of Petitioner as the shooter in 2013 and how his statement differed from the one he gave to police in 2011, trial counsel argued:

> All of a sudden the story is changed. Right? Two years ago the guy was wearing a tank top, a white wife beater tank top. Now he's not wearing a shirt at all.  How does that happen? Is he trying to comport his story to the girl's story to make him look more credible, to get help for his case?  This is a man who lies for a living, he gets paid to be a liar?

(*Id.*)  During its rebuttal closing argument, the State responded, without objection, "When you are encouraged to speculate and there's no evidence to fuel the speculation, you should reject that suggestion because it's contrary to the oath you took" to decide the case based on the evidence.  (D.I. 20-10 at 29)  The State then argued that no evidence had been presented at trial suggesting that Boston changed his testimony in June 2013 because he knew what Brianna and Dajuan'ya told police two years earlier. (D.I. 20-5 at 35-36)  The State also argued, without objection, that Boston had not received a benefit for his testimony:

> Now, you remember [trial counsel], when he was talking about it, said we don't know if he received a benefit.  Well, actually we do because Thurman Boston told you that he and the prosecutor who handled the case told you the same thing. And there's no evidence to the contrary.

(*Id.*)

As he did in the Delaware state courts, Petitioner now contends that the State improperly shifted the burden of proof to the defense during its rebuttal closing argument by asserting that the jury should not speculate about the reasons for Boston's

15

differing statements.  The Delaware Supreme Court rejected this argument on direct appeal after determining that the State's assertion was not improper.

"[I]t is the province of the jury to weigh the credibility of competing witnesses." *Kansas v. Ventris*, 556 U.S. 586, 594 n* (2009).  Viewed in context, the State's comment about the "rule against speculation" properly encouraged the jury to assess witness credibility based on record evidence, not speculation.  The comment did not improperly shift the burden of proof because, in essence, it simply asserted that the evidence did not support the defense's claims about Boston. *See Kent*, 2016 WL 1039125, at *4.  Accordingly, the Court concludes that the Delaware Supreme Court did not unreasonably determine the facts or unreasonably apply clearly established federal law in holding that the State did not engage in prosecutorial misconduct when making its comment about the "rule against speculation."

### 2.  Petitioner's letter to nephew and Archy's testimony

During closing, trial counsel argued that Petitioner wrote a letter to his nephew asking for help in finding witnesses.  (D.I. 20-10 at 27)  According to trial counsel, the letter stated: "If they say the same shit in court, they are going to convict me." (*Id.*)  In rebuttal, the State argued that the defense's suggestion did not support the idea that Petitioner wrote the letter in an attempt to support the investigation. (*Id.* at 33)  Specifically, the State asserted that "trial counsel didn't read this sentence: 'If they say the same stuff in court they're going to convict me.'" (*Id.*)  The Superior Court called the parties to a sidebar and admonished the State because its assertion that trial counsel had not read the end of the letter was factually incorrect. (*Id.*)  The Superior Court ordered the State to "clean it up." (*Id.*)  Upon resuming its closing, the State said,

"Ladies and gentlemen, my recollection is not always perfect. I am informed that [trial counsel] read that last sentence and I apologize to you and to [trial counsel]." (Id.)

Also during closing, the State made the following comment about Archy's testimony: "Well, what we know from all the other witnesses is that the sound that Wallace Arch[y] is talking about is the gunshot and that immediately after the gunshot the car took off and was moving quickly down the street." (D.I. 20-10 at 35) Petitioner objected and, at a sidebar, stated that "Mr. Arch[y's] testimony or statement to the police was that he heard the sound and then 10 to 15 seconds later is when he saw the car." (Id.) The State offered to "fix that" and, upon resuming its argument to the jury, provided the following clarification: "Wallace Arch[y], I think, said to the police he heard a gunshot, 10 or 15 seconds later he looks into the intersection, sees a car going through it." (Id.)

In his motion for new trial, Petitioner complained about both of the aforementioned comments by the State. Petitioner argued that the State's comment about Petitioner's letter to his nephew improperly shifted the burden of proof to Petitioner. (D.I. 20-10 at 70-71) Petitioner also argued that the "steps taken to mitigate the effects of the error [made with respect to Archy's testimony] were not enough to ensure that [Petitioner] had a fair trial," because the State provided its clarification without acknowledging that its prior comment about Archy's testimony was factually incorrect. (D.I. 20-10 at 73)

When denying Petitioner's motion for new trial, the Superior Court only explicitly addressed Petitioner's argument about Archy's testimony. (D.I. 20-10 at 125-136) The Superior Court held that the "State's description of 'immediately after' in its appropriate

17

context clearly shows that the prosecutor was making the point that the witness wasn't looking towards the intersection until after he heard the gunshots" and that the "State's argument . . . had nothing to do with the period of time it took Archy to look after hearing the gunshot." (D.I. 20-10 at 136) The Superior Court concluded that "the difference between 'immediately after' and '10 to 15 seconds later' is not only splitting hairs, but irrelevant. Accordingly, the minor difference that [Petitioner] challenges was not improper, nor was it prosecutorial misconduct." (*Id.*)

On direct appeal, Petitioner again argued that the State's inaccurate comments about Petitioner's letter to his nephew and Archy's testimony constituted prosecutorial misconduct. The Delaware Supreme Court held that, while the State's inaccurate statements arguably constituted misconduct, the inaccurate statements were corrected immediately. *See Kent*, 2016 WL 1039125, at *4. As a result, the Delaware Supreme held that the trial court did not err in denying Petitioner's motion for new trial on the basis of the State's inaccurate comments. *See id.*

After reviewing the record, the Court concludes that the Delaware Supreme Court reasonably applied clearly established federal law in rejecting the instant two sub-arguments of Claim Two. First, the Delaware Supreme Court properly examined the State's comments in the context of the entire trial. Second, any prejudice from the State's improper assertions was cured by the Superior Court calling the two side-bars, its act of providing the State with an opportunity to correct its misstatements, and the State's immediate apology regarding its comment about Petitioner's letter and its clarification about Archy's testimony. (D.I. 10-20 at 33)

In addition, there was substantial evidence of Petitioner's guilt. Petitioner shot

18

Lee in the presence of three eyewitnesses whose testimony, if believed, established Petitioner's guilt.

After viewing all of these factors in context with the entire trial, the Court concludes that the Delaware Supreme Court reasonably applied clearly established federal law in holding that the State's comments about Petitioner's letter to his nephew and Archy's testimony did not so infect the trial with unfairness so as to constitute a denial of due process. Accordingly, the Court will deny the two instant sub-arguments of Claim Two for failing to satisfy § 2254(d).

### C. Claim Three: Conflict of Interest

> Shortly after [the two attorneys from the OPD were] appointed, [Petitioner's] counsel sent the State a discovery request, which included a request for a list of the State's witnesses. The State responded, but did not provide a list of witnesses, citing concerns for the witnesses' safety. This concern may have received some confirmation in May 2014 when Wilmington Police came into possession of a letter from [Petitioner] requesting that his nephew locate the witnesses to the crime.

> On July 16, 2014, defense counsel again requested a witness list. One reason defense counsel requested the names of the witnesses was to identify potential conflicts of interest. The State requested a protective order for the witness list on July 29, 2014, protecting against disclosure of the names to the defendant. In the weeks that followed, a number of witness statements were provided to [Petitioner's] attorneys.

> *          *          *

> During pretrial proceedings, the trial court also heard arguments regarding a potential conflict of interest resulting from the [OPD's] representation of [one of the three eyewitnesses – Boston – ] in an unrelated matter. At the trial court's request, [Petitioner] filed a memorandum of law requesting that the [OPD] be allowed to withdraw as [Petitioner's] counsel, or in the alternative, prohibiting Boston

19

from being called as a witness.  On August 26, 2014, the trial court requested additional information in support of [Petitioner's] motion for an in-camera review.  [Petitioner's] trial counsel declined to provide the additional information requested on the grounds that Boston did not give permission to release confidential information.  On September 2, 2014, the trial court reminded [Petitioner's] trial counsel that it could reveal Boston's confidential information upon court order, but counsel did not respond or comply with the trial court's request until after the trial court informed counsel of its decision to deny the request.

The trial court issued an opinion denying [Petitioner's] motion to prohibit Boston from being called as a witness or for appointment of new counsel on September 3, 2014.  The representation of Boston had concluded by March of 2014, approximately six months before [Petitioner's] trial. The trial court found that [Petitioner's] trial counsel failed to meet their burden of showing that a conflict did exist because the only evidence offered was an alleged conflict due to Boston's mental health history, which the trial court determined was public knowledge. Without any other evidence, the trial court held that there was no actual conflict regarding the representation of Boston on the unrelated charges.

*Kent*, 2016 WL 1039125, at *1-2.

In Claim Three, Petitioner contends that the Superior Court erred by not concluding that trial counsel had a conflict of interest, and that the court should have either granted his motion to exclude Boston's testimony or have appointed new counsel to represent him.  (D.I. 15 at 9-10)  Petitioner asserts that a presumption of prejudice arose from trial counsel's actual conflict and that the "Delaware courts thus applied the wrong standard of law." (*Id.* at 11)  Distilled to its core, Petitioner's argument appears to be that the Delaware courts conducted an inadequate inquiry into the conflict-of-interest issue.

On direct appeal, Petitioner argued that the Superior Court "erred in denying his

20

motion [for the OPD] to withdraw or prohibit Boston from testifying because another attorney from the [OPD] represented Boston, which created a conflict of interest with his trial counsel." *Kent*, 2016 WL 1039125, at *3. The Delaware Supreme Court rejected Petitioner's argument and affirmed the Superior Court's decision, opining that Petitioner "fail[ed] to show how he was prejudiced when the [OPD] represented Boston in matters that are completely unrelated to this case." *Id*. The Court views the Delaware Supreme Court's decision as an adjudication of Claim Three. Therefore, Petitioner will only be entitled to habeas relief if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

The Sixth Amendment guarantees a criminal defendant "the right to adequate representation by an attorney of reasonable competence and the right to the attorney's undivided loyalty free of conflict of interest." *United States v. Gambino*, 864 F.2d 1064, 1069 (3d Cir.1988). It is well-settled that an attorney's concurrent multiple representation violates the Sixth Amendment if it creates an actual conflict of interest that adversely affects the lawyer's performance. *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980); *see also Holloway v. Arkansas*, 435 U.S. 475, 482 (1978). When presented with a timely objection to concurrent multiple representation, a state trial court is required to initiate an inquiry into whether an actual conflict of interest exists or will probably develop during the course of a trial. *See Sullivan*, 446 U.S. at 348; *Wheat v. United States*, 486 U.S. 153, 160 (1988). A trial court satisfies this threshold duty of determining if disqualification is appropriate by conducting "an evidentiary hearing or factual inquiry [...] into the nature of the conflict and the client's awareness of the conflict." *Gov't of Virgin Islands v. Zepp*, 748 F.2d 125, 139 (3d Cir. 1984).

21

Pursuant to *Sullivan*, a "defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Sullivan,* 446 U.S. at 349–50.  Although the Supreme Court has not yet held that *Sullivan*'s presumed prejudice standard applies to conflicted successive representation,[3] the Third Circuit has applied the principles established in *Sullivan* to at least one case involving successive representation.  *Harmer v. Sup't Fayette SCI*, 2021 WL 3560666, at *3 n.6 (3d Cir. Aug. 12, 2021) ("We therefore assume without deciding that *Sullivan* applies in cases of successive representation.").  Consequently, when a potential conflict of interest is due to successive representation, a habeas petitioner in this circuit establishes an actual conflict by showing the following two elements:

> First, he must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.
>
> Clearly, a defendant who establishes that his attorney rejected a plausible defense because it conflicted with the interests of another client establishes not only an actual conflict but the adverse effects of it.

*United States v. Gambino*, 864 F.2d 1064, 1070–71 (3d Cir. 1988) (cleaned up); *see Harmer*, 2021 WL 35066, at *3 (applying *Gambino*'s standard for determining the existence of an actual conflict to a successive representation case).  The "critical inquiry is whether counsel actively represented conflicting interests." *Zepp*, 748 F.2d at 135. There must be a point where "the defendants' interests diverge with respect to a

---

[3]*See Mickens v. Taylor*, 535 U.S.162 (2002).

22

material factual or legal issue or to a course of action." *Sullivan v. Cuyler*, 723 F.2d 1077, 1086 (3d Cir. 1983). This could result from refusing to cross-examine a witness, failing to respond to inadmissible evidence, or failing to "diminish the jury's perception of a [co-conspirator's] guilt." *Sullivan*, 446 U.S. at 349. A petitioner can also show that the attorney failed to pursue an alternative strategy that "(a) could benefit the instant defendant and (b) would violate the attorney's duties to the other client." *United States v. Morelli*, 169 F.3d 798, 811 (3d Cir. 1999) (emphasis omitted). Such an alternative strategy need not "have been successful if it had been used" but must have "possessed sufficient substance to be a viable alternative." *Gambino*, 864 F.2d at 1070.

In this case, although the Delaware Supreme Court did not refer to United States Supreme Court precedent in affirming the Superior Court's denial of Petitioner's conflict-of-interest motion, its decision was neither contrary to, nor an unreasonable application of, clearly established federal law. In July 2014, once the State identified Boston as a witness, trial counsel immediately informed the Superior Court that another OPD attorney had represented Boston on charges unrelated to Petitioner's case from April 2013 to March 2014. *See State v. Kent*, 2014 WL 5390481, at *1 (Del. Super. Ct. Sept. 3, 2014). The Superior Court held an office conference to discuss the OPD's potential conflict on August 1, 2014, and ordered the parties to submit supplemental memorandum on whether a conflict existed and how to resolve it. (D.I. 20-3 at 28) At the office conference, trial counsel informed the Superior Court:

> During the course of representing Mr. Boston, [the OPD] used [its] staff, [its] services psycho-forensic evaluator to gather documentation of Mr. Boston's psychiatric treatment, particularly medications that he was on, and from that investigation or from that, gathering that evidence, [the OPD]

23

> learned and through the course of attorney/client privilege that
> [the OPD] ha[s] with Mr. Boston, [the OPD] understand[s] that
> he is being treated for psychological issues.

(D.I. 20-3 at 24)  Trial counsel also claimed that "[t]hose medications have side effects, which affect [Boston's] ability to perceive and, you know, observe." (*Id.*)

In their subsequent memorandum to the Superior Court, trial counsel claimed that "[a]s part of Mr. Boston's defense, the Public Defender's psycho-forensic evaluator completed an assessment of Mr. Boston," and the OPD "accessed and reviewed his medical records and prescription information." (D.I. 20-3 at 31)  Trial counsel also said that "[t]hese files are still currently located in the office." (*Id.*)  Trial counsel requested that the Superior Court "prohibit the State from calling Thurman Boston in its case-in-chief or in the alternative appoint new counsel for [Petitioner]." (*Id.* at 36)  On August 26, 2014, the Superior Court advised the parties that trial counsel have "the burden of presenting issues showing a conflict." (*Id.*)  The Superior Court found that "Boston's mental health history is public knowledge," and it ordered trial counsel to file "helpful information to support [Petitioner's] motion" for an *in camera* review by August 29, 2014. (*Id.*)  Trial counsel responded that they were unable to provide such information because "Boston had not given Defense Counsel permission to reveal confidential information." (*Id.*)

On September 2, 2014, the Superior Court reiterated its prior instruction about trial counsel providing additional information and advised that trial counsel was permitted to reveal a client's confidential information upon Court order. *See Kent*, 2014 WL 5390481, at *1.  Because trial counsel failed to provide additional information about the conflict, on September 3, 2014, the Superior Court denied trial counsel's request to

withdraw by email. *Id*. On the same day, the Superior Court issued an opinion finding that the OPD's successive "representation of Boston and [Petitioner] are not substantially related" for purposes of Delaware Lawyers Rules of Professional Conduct. *Id*. at *3. The Superior Court determined that trial counsel had "offered a merely conclusory assertion that [trial counsel] was in possession of confidential information that would be materially adverse to Boston if used against him for impeachment purposes at [Petitioner's] trial." *Id*. at *4. The Superior Court also found that "Boston's mental health history is public knowledge and informed the parties as such." *Id*. The Superior Court concluded that "there is no actual conflict of interest and Defense Counsel's continued representation of [Petitioner] is appropriate." In reaching this conclusion, the Superior Court recited *Sullivan*'s standard for determining the existence of an actual conflict of interest, and applied that rule to facts of Petitioner's case within the framework established by Delaware caselaw and Delaware's Rules of Professional Conduct concerning successive representation. *See Kent*, 2014 WL 5390481, at *3-4.

At trial, trial counsel noted that they had emailed the Superior Court *ex parte* with additional information about the alleged conflict. (D.I. 20-9 at 133) The Superior Court judge noted that he "had already ruled and [he] saw an e-mail from [trial counsel] governing conflict of interest. [He] ha[d] not opened it." *Id*. Subsequently, the State called Boston to testify in its case-in-chief. (D.I. 20-9 at 203) Boston explained his past interactions with Petitioner, what he saw during Lee's shooting, his relationship with the police as a paid informant, his history of mental illness, his past convictions, and his inconsistent statements to the police about his recollection of the shooting. (*Id*. at 205-222) Trial counsel cross-examined Petitioner about his conflicting statements to the

25

police, as well as his motive for providing information to the police about the shooting. (*Id.* at 224-231)

This record demonstrates that the Superior Court satisfied its threshold duty of inquiry into the OPD's alleged conflict with Boston.  Significantly, even though the Superior Court provided the OPD with an opportunity to prepare a record for the state court's consideration of the conflict issue, the OPD failed to provide any information concerning the alleged confidential information regarding the OPD's representation of Boston to support its conclusory assertion of a conflict.  The Delaware Supreme Court reasonably relied on the Superior Court's attempts to have the OPD establish a record to support Petitioner's conflict claim and reasonably relied on the Superior Court's determination that Petitioner did not meet his burden.  Notably, Petitioner did not demonstrate that the OPD's interests and his interests diverged "with respect to a material factual or legal issue or to a course of action,"[4] nor did he identify "that some plausible defense strategy or tactic might have been pursued ... [and] that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."  *Gambino*, 864 F.2d at 1070.  As a result, the Court concludes that the Delaware Supreme Court reasonably determined the facts in finding that Petitioner did not provide sufficient evidence of an actual conflict of interest. Additionally, although the Delaware Supreme Court did not reference *Sullivan* or its progeny when affirming the Superior Court's rejection of Petitioner's conflict of interest argument, the state court's focus on Petitioner's failure to provide sufficient information to support his allegation of a conflict mirrors the inquiry required by *Sullivan* and its

---

[4] *Zepp*, 748 F.2d at 135.

progeny.  Thus, the Delaware Supreme Court's decision was not contrary to clearly established federal law.

The Delaware Supreme Court also reasonably concluded that Petitioner was not prejudiced by the OPD's representation of Boston in the unrelated matter.  The record shows that trial counsel extensively cross-examined Boston about his inconsistent statements to the police describing the shooter as well as his motive in eventually identifying Petitioner as the perpetrator.  To the extent Petitioner asserts that trial counsel was unable to cross-examine Boston about his mental health, Petitioner has not shown how Boston's mental health would have been probative to impeach his testimony.  Notably, while cross-examining Boston, trial counsel also asked to approach at a sidebar.  (D.I. 20-9 at 232)  There, trial counsel referred to the "prior conflict issue about the mental health records" and stated that he "just want[ed] to make a record, [he's] making a tactical decision not to raise [Boston's] mental health issue just in case." (*Id.*)  Trial counsel also represented that he "had a general discussion with Mr. Boston about the fact that he was represented in 2013 by the [OPD] and would be cross-examined by a different lawyer in the [OPD] in this case."  (*Id.*)  Trial counsel "asked [Boston] if he had any concerns about it, [and] he said absolutely not."  (*Id.*)

Based on the foregoing, the Court will deny Claim Three for failing to satisfy the standard in § 2254(d).

### D. Claim Four:  Trial Counsel Did Not Provide Additional Information About The OPD's Conflict-of-Interest In A Timely Manner

In Claim Four, Petitioner asserts that trial counsel provided ineffective assistance

by belatedly providing additional information to the Superior Court about the OPD's conflict of interest due to its former representation of Boston. Petitioner contends that the Superior Court instructed trial counsel that they could submit the information for *an in camera* review, but they waited until after the Superior Court issued its ruling denying Petitioner's motion to prohibit Boston from testifying or to appoint new counsel before providing the new information.

The record reveals that Petitioner did not raise this argument in his initial Rule 61 motion. Instead, he presented it in his first Rule 61 appeal when he responded to his post-conviction counsel's motion to withdraw under Delaware Supreme Court Rule 26 (c). *See Kent*, 2018 WL 3156987, at *4. The Delaware Supreme Court invoked Delaware Supreme Court Rule 8 and only reviewed the argument in Claim Four for plain error because Petitioner had failed to raise the argument in his initial Rule 61 motion. The Delaware Supreme Court denied Claim Four after holding that there was no plain error.[5] *See Kent v. State*, 189 A.3d 1255 (Table), 2018 WL 3156987, at *5 (Del. June 26, 2018).

By applying Rule 8 to deny Claim Four in Petitioner's first post-conviction appeal, the Delaware Supreme Court plainly stated that its decision rested on state law grounds. *See Harris v. Reed*, 489 U.S. 255, 261 (1989). Delaware Supreme Court

---

[5]Petitioner presented Claim Four in a second Rule 61 motion, which the Superior Court summarily dismissed as procedurally barred under Rule 61(d)(2) for being a successive motion. (D.I. 20-14 at 51-53, 58) The Delaware Supreme Court affirmed that decision. *See Kent v. State*, 225 A.3d 316 (Table), 2020 WL 411333, at *1 (Del. Jan. 24, 2020). Since the Delaware Supreme Court's application of Rule 8 to Petitioner's first Rule 61 motion provides a sufficient reason to find that Claim Four is procedurally barred, the Court need not consider whether the Delaware Supreme Court's application of Rule 61(d)(2) to Petitioner's subsequent Rule 61 motion provided a second layer of default.

Rule 8 constitutes an independent and adequate state ground for procedural default purposes. *See Campbell v. Burns*, 515 F.3d 172, 182 (3d Cir. 2008). Thus, the Court cannot review the merits of Claim Four absent a showing of cause for the default, and prejudice resulting therefrom, or that a miscarriage of justice will occur if the Claim is not reviewed.

Petitioner does not assert any cause for his default of Claim Four.[6] Although the absence of cause obviates the need to address the issue of prejudice, the Court nevertheless concludes that Petitioner cannot establish that he has been prejudiced by the default of Claim Four. Since, as previously explained, Petitioner failed to show that the OPD's prior representation of Boston in an unrelated proceeding created an actual conflict of interest, *see supra* at Section III.C, Petitioner is not entitled to any presumption of prejudice based on the OPD's representation in his case.

Additionally, Petitioner has not shown that the additional information concerning the alleged conflict would have caused the Superior Court to either appoint new counsel to represent him or exclude Boston's testimony. Nothing in the record indicates that the additional impeachment information concerning Boston's mental health issues would even have been admissible at trial. Petitioner does not allege or show that if the impeachment evidence had been admitted it would have affected the jury's reception of the testimony from the other eyewitnesses.

Finally, the miscarriage of justice exception to the procedural default doctrine

---

[6]Although Petitioner contends that his default of Claim Five should be excused under *Martinez v. Ryan,* 566 U.S. 1, 9, 16-18 (2012) due to post-conviction counsel's failure to raise Claim Five in his initial Rule 61 motion, (*see* D.I. 15 at 14- 21), Petitioner does not assert the same argument with respect to his default of Claim Four. (D.I. 15 at 9-11)

cannot be used to excuse Petitioner's default, because Petitioner has not provided any new reliable evidence of his actual innocence. Accordingly, the Court will deny Claim Four as procedurally barred from federal habeas review.

### E. Claim Five: Counsel Did Not Call Shaleece Queen as an Alibi Witness

Next, Petitioner contends that trial counsel provided ineffective assistance by not calling Shaleece Queen to testify as an alibi witness. (D.I. 15 at 18-21) Petitioner asserts that Queen was not called as a witness because trial counsel did not thoroughly investigate and, therefore, incorrectly believed that Petitioner had fathered a child with Queen and that she lacked credibility. (*Id.* at 18)

The record reveals that Petitioner did not exhaust state remedies for Claim Five because he did not fairly present the issue contained therein to the Delaware Supreme Court in either his first or second Rule 61 proceeding.[7] At this juncture, any attempt by Petitioner to present Claim Five in a new Rule 61 motion would dismissed as time-barred under Rule 61(i)(1). *See DeAngelo v. Johnson*, 2014 WL 4079357, at *12 (D.

---

[7]Petitioner did not present Claim Five in his first Rule 61 motion or appeal, but did raise it in his second Rule 61 motion. (D.I. 20-14 at 47-49) The Superior Court summarily dismissed Petitioner's second Rule 61 motion as barred under Rule 61(d)(2) for being a second or subsequent post-conviction motion. (*Id.* at 52-53) Although Petitioner appealed the denial of his second Rule 61 motion, he did not include Claim Five in his appeal to the Delaware Supreme Court. (D.I. 20-13) Instead, he argued that *post-conviction counsel* provided ineffective assistance in his initial Rule 61 appeal by failing to include Claim Five as part of his first Rule 61 appeal. (D.I. 20-13 at 7-10) An argument regarding post-conviction counsel's failure to properly investigate trial counsel's failure to call Queen as a witness is not the same as an argument concerning trial counsel's failure to call Queen as a witness. Given the substantial underlying difference between the two arguments, the Court concludes that Petitioner did not fairly present Claim Five to the Delaware Supreme Court in his second Rule 61 appeal. *See, e.g., Glass v. Vaughn*, 65 F.3d 13, 15 (3d Cir. 1995) (finding that an ineffective assistance of post-conviction counsel claim did not fairly present the issue of trial counsel's ineffectiveness).

30

Del. Aug. 15, 2014).  Although Rule 61(i)(1) provides for an exception to the one-year time limitation if the untimely Rule 61 motion "asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final," no such right is implicated in the instant Claim.  Similarly, the exceptions to the bars in Rule 61(i)(1) contained in Rule 61(i)(5) and (d)(2) do not apply to Petitioner's case, because he does not allege actual innocence, lack of jurisdiction, or that a new rule of constitutional law applies to the instant arguments.  Given these circumstances, the Court must treat Five as exhausted but procedurally defaulted, meaning that the Court cannot review the merits of the Claim absent a showing of cause-and-prejudice or a miscarriage of justice.

Petitioner attempts to establish cause under *Martinez v. Ryan* by arguing that post-conviction counsel's failure to include Claim Five in his initial Rule 61 proceeding was due to post-conviction counsel's ineffective failure to review the OPD's entire "161 log notes." (D.I. 15 at 14-15).  In *Martinez*, the Supreme Court held that inadequate assistance of counsel during an initial-review state collateral proceeding may (under certain circumstances) establish cause for a petitioner's procedural default of a claim of ineffective assistance of trial counsel.  *See Martinez*, 566 U.S. at 12, 16-17.  The Third Circuit has explained the application of *Martinez* in habeas cases:

> *Martinez* recognizes a narrow exception to the doctrine of procedural default: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial. This exception is available to a petitioner who can show that: 1) his procedurally defaulted ineffective assistance of trial counsel claim has "some merit," and that 2) his state-post conviction counsel was ineffective under the standards of *Strickland v. Washington*.

*Workman v. Sup't Albion SCI*, 915 F.3d 928, 937 (3d Cir. 2019).  "To demonstrate that

31

his claim has some merit, a petitioner must 'show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.' " *Id.* at 938 (*quoting Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)). To demonstrate that post-conviction counsel's ineffectiveness caused the procedural default, a petitioner must show that post-conviction counsel's performance was deficient under the first prong of the *Strickland* standard, *i.e.*, "that his state post-conviction counsel's performance fell below an objective standard of reasonableness." *Workman*, 915 F.3d at 941.

Petitioner has failed to demonstrate that post-conviction counsel's actions excuse his default of Claim Five under the limited exception recognized in *Martinez*. First, Petitioner has failed to show that his underlying ineffective assistance of counsel claim is substantial. In some circumstances, a trial attorney's decision not to call a given witness can be strategically sound even though it is based on a potentially erroneous assumption. *See Diggs v. Owen*, 833 F.2d 439, 445-46 (3d Cir. 1987) (finding trial counsel's decision not to call defendant's wife as alibi witness to be strategically sound even if it was based on an erroneous assumption that wife's refusal to testify before the grand jury could be used to impeach her at trial because wife's testimony would have appeared self-serving and presenting her might have caused the jury to focus its attention on a defense that seemed contrived rather than on the possible weakness of the state's case). According to the OPD's log notes, trial counsel did investigate calling Queen as a witness at trial. As a result, trial counsel's failure to call Queen as a witness was not due to a "less than complete investigation." (D.I. 15 at 19) Petitioner also

32

cannot demonstrate prejudice, which creates an additional barrier for showing that his underlying ineffective assistance of counsel claim is substantial. For instance, in his second Rule 61 motion, Petitioner argued that Queen's testimony would have "put[] the defendant away from the scene during the time of the murder," and stated that she is credible. (D.I. 20-14 at 48-49) Yet, Petitioner did not – and still does not – explain how Queen's testimony would have supported his alibi defense.

Second, Petitioner has not shown that post-conviction counsel's ineffectiveness during his first Rule 61 proceeding caused the default. While it may be true that post-conviction counsel drafted Petitioner's amended Rule 61 motion before receiving all of the OPD's log notes, post-conviction counsel did eventually obtain all of the notes and actually reviewed them before deciding to withdraw certain claims from Petitioner's first Rule 61 motion. (D.I. 15 at 27) The fact that post-conviction counsel still did not include Claim Five in the amended Rule 61 motion after receiving and reviewing all of the OPD's log notes indicates that post-conviction counsel made a "tactical choice" to refrain from including Claim Five and did not commit an error based on inadequate investigation. *Workman*, 915 F.3d at 942. In short, *Martinez* does not provide an avenue for Petitioner to establish cause for his default.

In the absence of cause, the Court will not address the issue of prejudice. Additionally, Petitioner has failed to demonstrate that a miscarriage of justice will ensue if the Court does not review the merits of Claim Five. Petitioner's vague assertions about Queen's allegedly exculpatory potential testimony does not constitute new reliable evidence of his actual innocence. Accordingly, the Court will deny Claim Five as procedurally barred from federal habeas review.

### F. Claim Six: Cumulative Error

In his final Claim, Petitioner asserts that cumulative errors compromised his right to a fair trial and deprived him of due process. Petitioner presented the same "cumulative error" argument on direct appeal to the Delaware Supreme Court, which denied the argument as meritless. Therefore, Claim Six will only warrant habeas relief if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

The United States Supreme Court has not recognized the concept of cumulative error. *See Bush v. Carpenter*, 926 F.3d 644, 686 n.16 (10th Cir. 2019). Since there is no clearly established federal law with respect to a cumulative error argument, it would appear that the Court's § 2254(d) analysis is over and Petitioner is not entitled to habeas relief for Claim Six.

Nevertheless, the Third Circuit has recognized the cumulative error doctrine on habeas review, holding that "a cumulative error argument constitutes a stand-alone constitutional claim subject to exhaustion and procedural default." *Collins v. Sec'y of Pa. Dep't of Corr.* 742 F.3d 528, 542 (3d Cir. 2014). Pursuant to the cumulative error doctrine,

> [i]ndividual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice.

*Fahy v. Horn,* 516 F.3d 169, 205 (3d Cir.2008). Given the Third Circuit's recognition of

34

the cumulative error doctrine in habeas proceedings, the Court will exercise prudence and review Claim Six.

Here, the Delaware Supreme Court reviewed and rejected each alleged underlying error on its merits, and also rejected Petitioner's cumulative error argument without analysis because it found that his claims lacked merit. *See Kent*, 2016 WL 1039125, at *4. As previously discussed, this Court has also concluded that Claims One through Five lack merit. Since Petitioner has not provided anything to demonstrate "actual prejudice" even when the five Claims are considered together, the Court will deny Claim Six as meritless.

**IV.    CERTIFICATE OF APPEALABILITY**

A district court issuing a final order denying a § 2254 petition must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011); 28 U.S.C. § 2253(c)(2). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court has concluded that the instant Petition does not warrant relief. Reasonable jurists would not find this conclusion to be debatable. Accordingly, the Court will not issue a certificate of appealability.

**V.    CONCLUSION**

For the reasons discussed, the Court concludes that the instant Petition must be denied. An appropriate Order will be entered.

35